# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 20-CR-185 (JFB)

---

UNITED STATES OF AMERICA,

VERSUS

JUVENILE MALE,

Defendant.

---

**MEMORANDUM AND ORDER**
July 6, 2022

---

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On May 20, 2020, the government filed a Juvenile Information against defendant Juvenile Male ("the defendant"),[1] charging him with the following: one count of racketeering, 18 U.S.C. §§ 1962(c), 1963, 5032 *et seq.*; two counts of murder in aid of racketeering, 18 U.S.C. §§ 2, 1959(a)(1), 5032 *et seq.*; and one count of conspiracy to distribute cocaine and marijuana, 21 U.S.C. §§ 841(b)(1)(C), 841(b)(1)(D), 846 *et seq.* These charges relate to the defendant's alleged participation, as a member of La Mara Salvatrucha, a violent street gang also known as MS-13, in the May 21, 2016 murder of Kerin Pineda, the October 10, 2016 murder of Javier Castillo, and the distribution of marijuana and cocaine between January 2016 and October 2017.

Before the Court is the government's motion under 18 U.S.C. § 5032 to transfer the case to district court in order to prosecute the defendant as an adult. This Memorandum and Order contains the Court's findings under Section 5032.

As discussed in great detail below, after carefully analyzing the required statutory factors, the Court concludes in its discretion that, notwithstanding the statutory presumption in favor of juvenile adjudication, the government here has rebutted that presumption and has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted.

---

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. *See* 18 U.S.C. § 5038(e). In order to comply with this provision and Section 5038's other requirements regarding the confidentiality of juvenile records, the Court has determined that these proceedings and all related documents should be sealed.

First, the nature of the alleged offenses overwhelmingly favors, in the interest of justice, transferring the case to district court to try the defendant as an adult. As detailed below, the defendant is charged with actively participating in two murders in aid of the MS-13 gang, as well as with distributing narcotics to finance gang operations. More specifically, the defendant is alleged to have engaged in the following conduct with respect to the charged offenses: (1) instigating the murder of Pineda, a suspected member of the rival 18th Street Gang, by setting up a Facebook page, on which the defendant posed as a female and initiated contact with Pineda; (2) notifying fellow MS-13 gang members of this contact and obtaining permission from clique leaders to proceed with the murder; (3) facilitating the murder by luring Pineda via Facebook communications to a wooded area in Freeport, New York, where other MS-13 members were waiting to kill him, and where Pineda was then murdered; (4) along with fellow MS-13 members, bringing Castillo, another suspected member of the 18th Street Gang, to an isolated area by the water in Freeport in order to murder him; (5) with other gang members, striking Castillo with a machete until he was dead; and (6) actively selling cocaine and marijuana to finance clique operations.

Accordingly, the Court finds that the extremely violent nature of the alleged murders, including the defendant's alleged active participation in both murders, is entitled to special weight in this case.

Second, the defendant's age and social background also favor transfer. The defendant was just over 16 when he allegedly instigated the murder of Pineda, 6 months away from his seventeenth birthday, when he participated in Castillo's murder, and between 16 and 17 when he distributed narcotics. He is now over 22 years old.

As for the defendant's social background, he benefited from a supportive family and at least some community ties, yet still allegedly chose to join the MS-13 and participate in these violent acts. Before moving to the United States, the defendant was raised by his mother and grandparents in El Salvador, with whom he had a close and loving relationship, and was an active member of his church and community. Upon arriving in the United States, the defendant lived for six months with his father in Texas before moving to Freeport to live with his older brother and extended family. In Freeport, the defendant worked steadily as a landscaper and spent time with his family on a near-daily basis, regularly attending church with them. However, despite these supporting and stabilizing influences, the defendant still chose to join the MS-13 (as the defendant concedes) and allegedly chose to commit these brutal murders. Further, the defendant did not disassociate from the gang after these alleged acts. Instead, the defendant was later convicted in state court of a conspiracy to commit another murder in aid of the MS-13, planned one year after the conduct charged here. And, despite his family's continued support, he was adjudicated by the Bureau of Prisons to have been involved in a gang-related physical altercation while incarcerated. In short, despite ongoing family support, the defendant's ties to the MS-13 gang, and his loyalty to that gang, appear to have been very strong. Thus, the Court finds that his age, social background, and history with the MS-13 gang favor transferring him to adult status.

Third, with respect to the nature and extent of the defendant's prior delinquency record, the defendant pled guilty in state court to conspiracy to commit another murder. The conspiracy took place approximately within a year of his alleged participation in the two murders at issue here.

Thus, this factor weighs strongly in favor of transfer.

Fourth, as for the defendant's present intellectual development and psychological maturity, the psychological examination of the defendant, conducted by the defense expert Dr. Eric Goldsmith, indicates that the defendant has no intellectual limitations, has no sign of any mental illness, and, aside from delayed walking, had met all of his developmental milestones in a normal timeframe. Moreover, the defendant reported doing well in school in El Salvador and, although he experienced some difficulty with the limited schooling he had in the United States, he had the maturity to obtain and maintain a regular job as a landscaper while taking night classes to learn English. Therefore, the defendant clearly had the intellectual functioning, as a juvenile, to understand both the violent nature of the MS-13 gang and the dire harm to others that would result from his alleged participation in the gang's conduct. Dr. Goldsmith also diagnosed the defendant with Cannabis Use Disorder and described the potential effects of long-term cannabis use on an adolescent's executive functioning. Although the Court credits Dr. Goldsmith's diagnosis, it concludes that the defendant's excessive marijuana use does not adequately explain his alleged violent tendencies (including his alleged pivotal and premeditated role in the murders). Accordingly, the Court concludes that this factor weighs strongly in favor of transfer.

Fifth, the nature of past treatment efforts weighs slightly in favor of transfer. Although the defendant did not receive any treatment or rehabilitative efforts prior to his incarceration, his limited treatment efforts to date do not show a likelihood that he will be successfully rehabilitated within the juvenile system. Moreover, as noted above, the defendant committed a disciplinary infraction during his federal detention that was directly related to ongoing participation in MS-13 activity. Based upon this record, it appears that the defendant's rehabilitation efforts are at their beginning stages, if at all.

Finally, with respect to the sixth factor, the government has failed to demonstrate the absence of available programs designed to treat the defendant's behavioral problems. Therefore, this factor weighs against transfer.

Although this final factor weighs against transfer, it does not outweigh the others that, in combination, overwhelmingly favor transfer. In particular, the violent and brutal nature of the alleged murders, including the defendant's alleged critical role in planning and executing them, the defendant's social background, and prior criminal history, overwhelmingly demonstrates that transfer is warranted. As the Second Circuit has emphasized, "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *United States v. Nelson ("Nelson II")*, 90 F.3d 636, 640 (2d Cir. 1996) (quoting *United States v. J.D.*, 525 F. Supp. 101, 103 (S.D.N.Y. 1981)). The Sixth Circuit has similarly reasoned that "a motion to transfer is properly granted where a court determines that the risk of harm to society posed by affording the defendant more lenient treatment within the juvenile justice system outweighs the defendant's chance for rehabilitation." *United States v. T.F.F., A Juvenile Male*, 55 F.3d 1118, 1121 (6th Cir. 1995) (quoting *United States v. One Juvenile Male*, 40 F.3d 841, 844 (6th Cir. 1994)). Here, after analyzing all the factors with respect to this defendant, the Court concludes that there is no likelihood that the goals of the juvenile system will be achieved while the defendant is in juvenile custody and, under the particular circumstances of this case, "the concerns of public protection and punishment become paramount." *Nelson II*, 90 F.3d at 640. In light of the entire record

and the statutory factors, the Court has no confidence that any juvenile rehabilitation efforts would be successful or would adequately mitigate the degree of danger and high risk of recidivism that the defendant would otherwise pose to society were he kept in the juvenile system. In other words, the Court concludes that the defendant's rehabilitation potential is low and that the juvenile justice system is simply ill-equipped and woefully insufficient, under the circumstances here, to adequately address, in the interest of justice, these alleged violent crimes when considered in conjunction with the other statutory factors.

Thus, after thoroughly considering and weighing the statutory factors, the Court has determined in its discretion that treating the defendant as an adult in this case will serve the interest of justice.[2]

## I. THE CHARGES[3]

The charges against the defendant stem from the government's continuing investigation into the MS-13 gang. (Gov't. Mem. at 2.) Since approximately 1998, MS-13 members on Long Island have engaged in street wars with rival gangs, which have resulted in the assault and murder of MS-13 and rival gang members, their family members, and innocent bystanders. (*Id.* at 2–

---

[2] This decision is consistent with others in which this Court transferred juveniles to adult status for their alleged participation in violent acts in connection with the MS-13 gang. *See, e.g.*, *United States v. Juvenile Female*, No. 19-CR-431 (JFB), 2022 WL 336570 (E.D.N.Y. Jan. 26, 2022) (defendant was just under 17 at time of, *inter alia*, the alleged brutal, premeditated murder of a suspected gang rival); *United States v. Juvenile Male*, 316 F. Supp. 3d 553 (E.D.N.Y. 2018) (defendant was just under 18 at time of alleged brutal murder of four suspected rival gang members and/or individuals believed to have disrespected MS-13 members); *United States v. Juvenile Male*, 327 F. Supp. 3d 573 (E.D.N.Y. 2018) (defendant was under 16 years old at time of alleged brutal murder of four suspected rival gang members); *United States v. Juvenile Female*, 313 F. Supp. 3d 412 (E.D.N.Y. 2018) (defendant was 17 years, 4 months old at time of alleged brutal murder of four suspected rival gang members); *United States v. Juvenile Male*, 269 F. Supp. 3d 29 (E.D.N.Y. 2017) (defendant was 16 years, 6 months old at time of alleged attempted murder of a rival gang member, and 16 years, 11 months old at time of alleged murder of an MS-13 member suspected of cooperating with law enforcement); *United States v. Juvenile Male*, No. 14-CR-645 (JFB), 2015 WL 6550344 (E.D.N.Y. Oct. 23, 2015) (defendant was 17 years, 10 months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, No. 11-CR-717 (JFB), 2013 WL 461220 (E.D.N.Y. Jan. 30, 2013) (defendant was 16 years, 7 months old at time of alleged attempted murder of a 16-year-old male, and 17 years, 8 months old at time of alleged murder of another individual);

*United States v. Juvenile Male*, No. 12-CR-317 (JFB), 2012 WL 6043271 (E.D.N.Y. Dec. 3, 2012) (defendant was 17 years, 4 months old at time of alleged brutal, premeditated murder of an individual believed to belong to a rival gang); *United States v. Juvenile Male*, 844 F. Supp. 2d 333 (E.D.N.Y. 2012) (defendant was 16 years, 3 months old at time of alleged murder of a 15-year-old); *United States v. Juvenile Male No. 2*, 761 F. Supp. 2d 27 (E.D.N.Y. 2011) (defendant was 16 years, 8 months old at time of alleged premeditated murder of 19-year-old woman and her 2-year-old son); *United States v. Juvenile Male*, 844 F. Supp. 2d 312 (E.D.N.Y. 2011) (defendant was 17 years, 6 months old at time of two alleged attempted murders); *United States v. Juvenile Male*, 754 F. Supp. 2d 569 (E.D.N.Y. 2010) (defendant was 17 years, 8 months old at time of alleged premeditated murder of 19-year-old woman and her 2-year-old son).

[3] The allegations set forth herein are drawn from the government's motion papers. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson ("Nelson I")*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offenses as they are alleged by the government and takes no position as to the strength of the evidence supporting those allegations.

4

3.) Upon induction into the MS-13 gang, members agree to kill rival gang members whenever possible. (*Id.* at 4.)

The defendant, an alleged member of the Sailors Locos Salvatruchas Westside ("Sailors") clique of the MS-13, is charged in connection with the murders of two suspected 18th Street gang members—Kerin Pineda and Javier Castillo—and with a conspiracy to distribute and the distribution of narcotics. (*Id.* at 3–4, 6, 8.)

A. The Murder of Kerin Pineda

According to the government, the defendant instigated Pineda's murder, participated in planning it, and assisted other MS-13 members in carrying it out. (*Id.* at 6–8.) More specifically, in 2016, the defendant, who suspected Pineda was a rival gang member, set up a Facebook page in order to pose as a female and initiate communications with Pineda, who later admitted to the defendant in online messages that he was a member of the 18th Street gang. (*Id.* at 6.) The defendant notified fellow members of both his own clique (the Sailors) and of another MS-13 clique, the Hollywood Locos Salvatruchas ("Hollywood"), that Pineda was in a rival gang and subsequently obtained approval for the murder from leaders of both cliques. (*Id.* at 6–7.)

On May 21, 2016, the day of the murder, the defendant—continuing to impersonate a female on Facebook—allegedly lured Pineda to a wooded area in Freeport by inviting him to smoke marijuana. (*Id.* at 7.) That evening, members of both the Sailors and Hollywood cliques lay in wait in the woods, armed with machetes. (*Id.*) Additional MS-13 members drove around the area to watch for police activity. (*Id.*) While the MS-13 members prepared for the murder, the defendant texted with Pineda to direct him to their location. (*Id.*) When Pineda arrived, he told the MS-13 members he was looking for a girl and, in response to their questioning, denied he was a member of 18th Street. (*Id.* at 8.) Despite his denials, the MS-13 members hacked Pineda to death with the machetes and buried him in a hole that defendant, with others, had dug the previous day. (*Id.*) The MS-13 members then contacted the members performing surveillance to ensure no police or witnesses were nearby before they exited the woods.

Shortly thereafter, Pineda was reported missing by his family. (*Id.* at 6.) Although initial law enforcement efforts to locate him were unsuccessful, members of the Federal Bureau of Investigation ("FBI") Long Island Gang Task Force (the "Task Force") eventually discovered Pineda's body in October 2017. (*Id.*)

B. The Murder of Javier Castillo

According to the government, the defendant and other MS-13 members concocted a plan to murder Castillo—who was 15 years old—because they suspected him of being a member of 18th Street. (*Id.* at 9.) On October 10, 2016, an MS-13 member who was friendly with Castillo lured Castillo into a car with other gang members and drove from Brentwood to Freeport, where they met up with additional MS-13 members. (*Id.*) Once all together, the MS-13 members led Castillo to Cow Meadow Park and brought him to an isolated area near the water. (*Id.*) There, the defendant and multiple other members took turns striking Castillo with a machete until he was dead, then dug a hole and buried his body. (*Id.*)

On October 13, 2017, Castillo's family reported him missing to local law enforcement. (*Id.* at 8.) Castillo's brother informed law enforcement that a family member with ties to the MS-13 had told him to stop looking for Castillo because he was "gone and buried." (*Id.*) On October 24, 2017, the Task Force located Castillo's body.

5

C. Narcotics Distribution

According to the government, during 2016 and 2017, members of the Sailors clique, including the defendant, sold cocaine and marijuana in order to finance their operations. (*Id.* at 10.) Clique leaders distributed the drugs to clique members, including the defendant, to sell and then return the proceeds to the clique. (*Id.*) The clique used the funds to send money to both MS-13 leaders in El Salvador and incarcerated clique members, purchase more narcotics, and to purchase firearms and ammunition. (*Id.*)

D. State Conviction

On January 8, 2018, the defendant was charged in New York state court with two counts of conspiracy to commit murder and two counts of conspiracy to commit narcotics offenses. (Gov't Ex. 2 (Nassau County District Court Records) at 5–51). Three days later, he was arrested by state law enforcement and detained pending trial.[4] (*Id.* at 55, 69.) On June 14, 2018, the defendant pled guilty to one count of the state indictment, which charged him with a July 2017 conspiracy to commit murder in second degree. (Gov't Ex. 2 at 71, 74.) The defendant was sentenced to three to nine years' imprisonment. (*Id.* at 70.) He served his sentence at a facility in upstate New York before being released back into ICE custody on January 16, 2020. (Gov't Ex. 6 (Criminal History) at 4.) On February 4, 2020, an arrest warrant was issued for the defendant in connection with a sealed federal complaint, (No. 20 MJ 115), and, in March 2020, he was transferred to federal custody, (Gov't Ex. 7 (MDC Records)).

II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *Nelson I*, 68 F.3d at 588 (quoting 18 U.S.C. § 5032).[5] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the alleged offenses; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) the availability of any programs that are designed to treat the

---

[4] At the time of his state arrest, the defendant was in Immigration and Customs Enforcement ("ICE") Custody, having failed to leave the United States on or before January 15, 2015, pursuant to the terms of his grant of voluntary departure. (Gov't Ex. 1 ("Immigration Records") at 1–14 (detailing the defendant's initial illegal entry into the United States in April 2014); *id.* at 15–18 (detailing his notice to appear and subsequent voluntary departure grant); *id.* at 32–35 (detailing his arrest by ICE agents on July 20, 2017).) When arrested by ICE, the defendant was wearing a Chicago Bulls hat and Nike Cortez shoes, and had a "Grim Reaper" screensaver on his cell phone, all of which are symbols and items associated with the MS-13. (*Id.* at 32–35.)

[5] In addition, Section 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted the required certification from the then-United States Attorney for the Eastern District of New York.

6

juvenile's behavioral problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See, e.g.*, *Nelson I*, 68 F.3d at 588; *United States v. Doe*, 49 F.3d 859, 868 (2d Cir. 1995).

Although the Court must evaluate each factor identified in Section 5032, it need not afford each factor equal weight, and "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing th[at] factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder." *Id.*

In weighing the factors, "the district court must keep in mind that '[p]ermeating the transfer decision and the six-factor inquiry is the notion of rehabilitation.'" *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002) (quoting *Nelson II*, 90 F.3d at 640). Indeed, "[r]ehabilitation clearly is one of the primary purposes of the juvenile delinquency provisions," *Nelson II*, 90 F.3d at 640 (quoting *Nelson I*, 68 F.3d at 590), and "the statutory factors have been identified primarily because of their impact on the juvenile's rehabilitative potential," *id.*

Even though that potential "is a crucial determinant in the transfer decision," it also "must be balanced against 'the threat to society posed by juvenile crime.'" *Id.* (quoting *J.D.*, 525 F. Supp. at 103). Accordingly, a "glimmer of hope" for a juvenile's future treatment prospects is insufficient to prevent transfer. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," *Nelson II*, 90 F.3d at 640 (quoting *In re Sealed Case (Juvenile Transfer)*, 893 F.2d 363, 365 (D.C. Cir. 1990)), which is a standard that "strikes the appropriate balance" between "affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)," *id.*[6] For the aforementioned reasons, explained more fully below, this Court hereby grants the government's motion to transfer the defendant to adult status.

### III. ANALYSIS OF FACTORS

#### A. Age and Social Background

##### 1. Age

The Second Circuit has instructed that a district court should consider a juvenile defendant's age both at the time of the alleged offense and at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that the district court correctly considered juvenile's age at the time of the offense but erred in not

---

[6] Section 5032 also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard.

also considering juvenile's age at the time of the transfer hearing). As for the juvenile defendant's age at the time of the alleged offense, "a crime committed when the juvenile was 'very young' or that was 'an isolated indiscretion' supports transfer less, whereas conduct that occurs closer to age 18 or over a prolonged period of time supports transfer more." *United States v. C.F.*, 225 F. Supp. 3d 175, 184 (S.D.N.Y. 2016) (quoting *Doe*, 49 F.3d at 867). The juvenile defendant's age at the time of the transfer hearing "is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate," considering that the older a juvenile defendant is, "the harder it becomes to reform the juvenile's values and behavior." *Nelson I*, 68 F.3d at 589 (internal quotation marks omitted). Accordingly, the older a juvenile defendant is both at the time of the alleged offense and at the time of the transfer hearing, the more the juvenile defendant's age weighs in favor of transfer. *See, e.g.*, *United States v. Juvenile Male*, 554 F.3d 456, 468–69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *C.F.*, 225 F. Supp. 3d at 184; *United States v. A.O.*, No. 15 Cr. 608-10 (KPF), 2016 WL 4197597, at *5 (S.D.N.Y. Aug. 8, 2016) (collecting cases); *United States v. Doe*, 145 F. Supp. 3d 167, 183 (E.D.N.Y. 2015) (collecting cases).

Here, the defendant was 16 and 1 month when he allegedly instigated the murder of Pineda, 16 and 6 months when he allegedly participated in Castillo's murder, and between 16 and 17 when he allegedly distributed narcotics. (Gov't Mem. at 20.) At the time of the transfer motion, the defendant was over 21 years old, (*id.*), and is currently approximately 22 years and 6 months. The defendant's age at the time of the charged conduct would typically weigh against transfer. *See Juvenile Male*, 327 F. Supp. at 582–83 (defendant's age of 15 years and 11 months weighed against transfer); *Juvenile Male*, 844 F. Supp. 2d at 339 (defendant's age of 16 years and 3 months at time of crime weighed against transfer); *United States v. Juvenile Male N.R.*, 24 F. App'x 638, 639–40 (8th Cir. 2001) (defendant's age of 16 at the time of the crime, along with his social background, weighed against transfer); *United States v. Anthony Y.*, 990 F. Supp. 1310, 1313 (D.N.M. 1998) (defendant's age of 16 and 2 months at the time of crime "favor[ed] retaining juvenile status"); *United States v. Nelson*, 921 F. Supp. 105, 114–15 (E.D.N.Y. 1996), *aff'd* 90 F.3d 636 (2d Cir. 1996) (defendant's age of 16 at the time of the crime, along with his potential receptivity to treatment and rehabilitation and his lack of criminal history, weighed against transfer). However, the defendant's history of criminal conduct—participating in two murders within a five-month period when he was 16, distributing narcotics up until age 17, and conspiring to commit another murder when he was over 17—demonstrates that the charged crimes were not "isolated indiscretion[s]" but rather, criminal conduct that occurred over a "prolonged period of time." *Doe*, 49 F.3d at 867 (concluding the district court did not abuse its discretion in finding that criminal activity committed by a defendant between the ages of 16 and a half and 17 favored transfer). Accordingly, the Court concludes that the defendant's age at the time of the charged conduct weighs in favor of transfer.

Moreover, the defendant's current age also weighs in favor of transfer. Insofar as rehabilitation is one of the main focuses of a district court in determining whether to transfer a defendant to adult status, the Court finds that the defendant's current age of over

8

22 years, which would allow him, at most, three years to rehabilitate himself, *see* 18 U.S.C. § 5037(c) (prescribing maximum detention terms for juveniles found to be juvenile delinquents), weighs in favor of transfer.[7]  *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant . . . [as] the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *Juvenile Male*, 554 F.3d at 468–69 ("In analyzing the first factor . . . we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Accordingly, the defendant's age at the time of the charged conduct and at the time of the hearing both favor transfer.

However, even if the Court disregarded both the defendant's current age and alleged prolonged pattern of criminal conduct, and instead limited its analysis to his age at the time of his alleged participation in the charged conduct, it would still conclude that transfer is warranted in the interest of justice after balancing all the required Section 5032 factors for the reasons discussed herein.

2. Social Background

The Court must also consider the defendant's social background to the extent that background is indicative of his potential for rehabilitation if adjudicated as a juvenile. As explained below, the Court finds that defendant's social background suggests a low likelihood of successful rehabilitation if he were adjudicated as a juvenile. Accordingly, the Court finds that this factor weighs in favor of transfer.

At the time of the conduct charged here, the defendant was living in a rented room in Freeport, New York. (Goldsmith Rep. at 3.)[8] The defendant spent the majority of his life in El Salvador, where he was raised by his mother and grandparents, who were farmers. (*Id.* at 2.) The defendant's father left El Salvador for the United States when the defendant was 6 years old and currently resides in Texas. (*Id.*) The defendant has two older brothers, one of whom lives in Long Island and owns a house remodeling

---

[7] The Court notes that courts in various circuits (including the Second Circuit) have transferred to adult status juvenile defendants who were younger than the defendant when they allegedly committed the charged crimes, including for alleged crimes less egregious than those charged here. *See, e.g., United States v. Sealed Defendant*, 714 F. App'x 65, 66–67 (2d Cir. 2018) (affirming transfer of defendant who was 15 years old at time of arrest for alleged shootings of rival gang members that resulted in four individuals being seriously injured); *United States v. Sealed Appellant 1*, 591 F.3d 812, 820–22 (5th Cir. 2009) (affirming transfer of defendant who was 15 years, four months old at time of alleged carjackings), *abrogated on other grounds by United States v. Davis*, 139 S. Ct. 2319 (2019); *United States v. Male Juvenile E.L.C.*, 396 F.3d 458, 460–63 (1st Cir. 2005) (affirming transfer of defendant who was 15 years, 9 months old at time of alleged murder of federal officer in an attempt to perpetrate an armed robbery); *United States v. Juvenile No. 1*, 118 F.3d 298, 311–12 (5th Cir. 1997) (affirming transfer of defendant who was 15 years, 6 months old at time of his alleged participation in violent armed robberies); *United States v. Jerry Paul C.*, 929 F. Supp. 1406, 1408 (D.N.M. 1996) (transferring defendant who was 15 years old at time of alleged murder).

[8] Citations to "Goldsmith Rep." refer to the January 28, 2022, psychiatric report prepared by Dr. Eric Goldsmith, the forensic psychiatrist retained by defense counsel to conduct a psychiatric evaluation of the defendant in connection with this motion.

9

company, and the other who lives in El Salvador and works as an architect. (*Id.*) The defendant has no reported family history of mental illness or substance abuse problems. (*Id.*)

The defendant was raised in the city of San Miguel in what his oldest brother describes as a "nice middle-class home with a living room, nice backyard and three bedrooms." (*Id.* at 7.) The defendant attended a Christian day school through the fifth grade before transferring to a public middle school, (*id.* at 2), where he ultimately completed the ninth grade, (Gov't Ex. 5 (Department of Corrections and Community Supervision Records) at 3). He was an average to above-average student and socialized well with his teachers and classmates. (Goldsmith Rep. at 2.) He enjoyed playing soccer at school and in the community and regularly attended church with his family. (*Id.* at 2, 7.)

The defendant described his early childhood as happy and says that his grandparents were engaged and "always supported [him]." (*Id.* at 3.) His grandfather taught him to play the guitar and "served as a strong father figure for him." (*Id.* at 7.) In El Salvador, the defendant "followed the example of his [older] brother . . . who associated him with peers who were positive and ambitious." (*Id.* at 4.) Aside from a single instance as a teenager where he was briefly detained by the police in El Salvador after being caught smoking cannabis, the defendant reported no legal or behavioral problems growing up. (*Id.*)

By the time the defendant was 14 years old, his family had become concerned about the increase of gang violence and activity in San Miguel, particularly as adolescent males were often being forced to join gangs. (*Id.* at 2, 6.) With the support of his family, the defendant decided to relocate to the United States. (*Id.* at 2.) The defendant illegally crossed the border into the United States and was quickly picked up by U.S. immigration authorities in McAllen, Texas. (*Id.*; Gov't Ex. 1 (Immigration Records) at 1–3.) After a short stay at a group home, the defendant was sent in May 2014 to live with his father in Irving, Texas. (Goldsmith Rep. at 2.)

The defendant had not seen his father since he was very young and reported being "a little uncomfortable" at first, although he reports that "things got better" after an approximately two-month adjustment period. (*Id.*) The defendant began working as a dishwasher and enrolled in high school. (*Id.*) However, because he did not speak English, he said he had a "difficult time" in school and was not happy living with his father.[9] (*Id.* at 2, 6.) By November 2014, six months after arriving in Texas, the defendant decided to relocate to Freeport, New York, where he moved in with his oldest brother and his aunt and uncle. (*Id.* at 2–3.)

In Freeport, the defendant had a "partially successful adjustment." (*Id.* at 6.) He began working as a landscaper and, although he did not enroll in high school, started taking English classes at night. (*Id.* at 3.) Because the house was crowded and he did not have his own room, within a few months the defendant moved out of his brother's house and rented a room nearby. (*Id.* at 3.) However, he still saw his brother nearly every day and was happy to be reunited with him. (*Id.* at 6.) The defendant spent most evenings and weekends with his brother and the rest of his family, "play[ing] video games, listen[ing] to music, read[ing] the Bible[,] and attend[ing] church services." (*Id.*) He

---

[9] In response to an order from the Court, the government subpoenaed Irvin High School in El Paso, Texas for records associated with the defendant. (Gov't Mem. at 15 n.2.) A representative from the school responded with an affidavit stating that the school had no records regarding the defendant. (*Id.*)

10

had a girlfriend from 2015 to 2016, and the relationship ended when he was arrested on the state charges. (*Id.* at 3.)

However, the defendant struggled with the loss of his mother and grandparents and experienced recurring depression. (*Id.*) At the age of 15, the defendant, who had first tried cannabis two years earlier, began smoking cannabis on a daily basis "to self-medicate his negative emotions." (*Id.* at 3,7; Gov't Ex. 8 (Nassau County Probation Records) at 7.) In New York, he felt "isolated, depressed[,] and lonely." (Goldsmith Rep. at 4). The defendant reports that he "made the decision to join the MS-13 gang" and stated that "[t]here is a lot of loneliness in this country." (*Id.*) As he reported later to the state correctional department, the defendant never sought any psychological treatment or substance abuse treatment. (Gov't Ex. 8 at 7.)

In October 2017, the defendant was arrested on the state conspiracy charges outlined above. (Goldsmith Rep. at 4.) During his state incarceration, he began pursuing a GED (narrowly failing the test to obtain his GED by two points), participated in a drug treatment program, (*id.* at 4–5), and received phone calls and visits from family members, (Gov't Ex. 5 at 6–11). He had no reported disciplinary issues in the New York state facility. (Goldsmith Rep. at 4.) In 2020, he was transferred into federal custody at the Metropolitan Detention Center ("MDC"), where he continued to receive visits from family and where his father regularly wired him money. (Gov't Ex. 7 at 6–7.) On May 25, 2020, he was involved in a gang-related physical altercation at the MDC and was punished with 30 days in solitary confinement and a temporary loss of email privileges. (*Id.* at 2–5.)

Reviewing the record in its entirety, the Court finds that the defendant's social background suggests a very low likelihood of rehabilitation within the period of time before his release if convicted as a juvenile.[10] As the government notes, the "defendant had a supportive family—in both El Salvador and the United States—and the natural ability to achieve in school, but he nonetheless affirmatively sought out membership in the MS-13." (Gov't Reply Mem. at 2.) According to Dr. Goldsmith's report, the defendant had several meaningful family relationships and role models, was a good student in El Salvador, attended church regularly both in El Salvador and the United States, and, while in New York, was regularly employed and working on his English. Despite all of these positive social influences that should have kept him from gang involvement, the defendant chose to join the MS-13 gang and allegedly participate in two murders.

Defense counsel argues that "[i]t can be assumed that because of the violent conditions in El Salvador, [the defendant] was an unsupervised juvenile for most of his teenage years" and further, that "since age 14, he was alone and unsupervised and it would seem became involved with undesirable members in his community." (Def. Memo at 2.) However, this contention is belied by the defendant's own account of his upbringing in El Salvador—which was loving and supportive—and of his experience in New York, where he spent the majority of his time with his older brother and extended family. Indeed, as defense counsel notes, the defendant "had a strong religious upbringing

---

[10] Specifically, the defendant can receive a maximum of three years' imprisonment if convicted in a juvenile proceeding. *See* 18 U.S.C. § 5037(c)(2)(B)(i)-(iii). While this case has been pending, he has already been incarcerated for more than two years and three months. However, even if the defendant were under the five-year provision, *id.* § 5037(c)(2)(A)(i)-(ii), the Court's conclusion would be the same.

11

and schooling in his home country and attended church with his brother on Long Island." (*Id.*) Yet, despite this familial and community support, which "hopefully imbue[d] in him a positive sense of morality and religiosity," (*id.*), the defendant chose to actively associate with a violent organization and allegedly commit heinous acts, *see United States v. Robinson*, 404 F.3d 850, 859 (4th Cir. 2005) ("Although Robinson's early years with his mother were not pleasant . . . , Robinson had been provided with a loving home for eight years prior to committing the crimes in question. We believe this factor weighed in favor of a transfer."); *Juvenile Male*, 269 F. Supp. 3d at 39 ("[T]he Court finds that, although there is no indication that the defendant's family condoned or accepted criminal activity, the defendant did not personally experience any abuse of any kind, and, despite his experience resulting from knowledge of the sexual assault of his mother, he had a stable family life both during his years in El Salvador and his years in the United States, the defendant chose to be a member of and a leader in MS–13."); *Juvenile Male*, 844 F. Supp. 2d at 340 ("[D]espite the defendant's stable, loving home life and his mother's efforts to prevent him from engaging in criminal activity, the defendant nevertheless allegedly chose to join a gang.").

The Court recognizes that the defendant experienced tragic personal loss and social disruption in moving to the United States, but does not find that these or other factors (such as feelings of depression, loneliness, or his cannabis use, discussed *infra*) outweigh the stabilizing forces present in his life that should have kept him from associating with the MS-13.[11] For all these reasons, the Court finds that this factor weighs in favor of transfer.

B. Nature of the Alleged Offense

As an initial matter, the Court notes that, in considering this factor, the Court must assume that the juvenile defendant

---

[11] The Court recognizes that, in other cases, a juvenile defendant's lack of stability in his or her social background has weighed in favor of transfer. *See, e.g., Doe*, 49 F.3d at 867 (affirming district court's conclusion that social background weighed in favor of transfer where, among other things, defendant's mother lived in Vietnam, his father had petitioned a family court for judicial supervision of defendant, and "by the time of the offenses charged . . . [defendant] was completely estranged from his father, preferring the violent BTK gang over his biological family"); *Juvenile Male No. 2*, 761 F. Supp. 2d at 36 ("[G]iven the defendant's continuing and long-term affiliation with his gang and the absence of any stable adult figures in his life who could possibly control his behavior, the Court finds that the defendant's social background makes it highly unlikely that he could be rehabilitated in the short period of time before he would have to be released from juvenile custody under federal law."). In other cases, a mix of positive and negative social influences weighed less strongly in favor of transfer. *See, e.g., Juvenile Male*, 554 F.3d at 469 ("The district court found that [the defendant] had been raised in 'a loving and intact family,' and saw nothing in his 'social background that would suggest to [him] that gang activity was acceptable behavior.' In contrast to his family situation, however, [the defendant's] life outside the home was not stable. He joined MS-13 around the age of fourteen, and dropped out of school during the ninth grade when his grades and behavior deteriorated. [The defendant] began abusing alcohol at the age of fifteen or sixteen and started using cocaine and marijuana shortly thereafter. Such behavior indicates a lack of structure and support, and accordingly weighs against his transfer. In these circumstances, the district court did not clearly err in concluding that [the defendant's] social background 'minimally' favored his transfer to adult prosecution."). Here, however, the Court finds that the defendant's social background weighs in favor of transfer given that the defendant generally had a supportive family life, did not "personally experience any abuse," "there [wa]s no indication that the defendant's family condoned or accepted criminal activity" yet he still chose to join the MS-13, and there was "evidence the defendant ha[d] chosen not to disassociate from" the gang. *Juvenile Male*, 269 F. Supp. 3d at 39 (finding social background favored transfer).

12

committed the offenses charged and abstain from examining the strength of the government's evidence. *See, e.g., United States v. Sealed Defendant*, 714 F. App'x 65, 67 (2d Cir. 2018) ("[T]he district court correctly assumed, for purposes of the transfer hearing, that the government's allegations against B.M. are true."); *Nelson I*, 68 F.3d at 589 ("We think that it is the better practice for the district court simply to assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information."). Additionally, as explained above, the Court may weigh this factor more heavily than any other when the alleged offense is particularly serious. *See, e.g., Ramirez*, 297 F.3d at 193 (quoting *Nelson I*, 68 F.3d at 590).

Here, the seriousness of the alleged offenses cannot be overstated. The defendant is charged with two premeditated, brutal murders committed on behalf of the MS-13 gang. Regarding Pineda's murder, the government alleges that the defendant instigated Pineda's death because he wanted to be promoted within the Sailors clique. The defendant targeted Pineda by setting up a Facebook page, communicating with him while posing as a female, and ultimately, luring him over text messages to a wooded area, where members of the MS-13 were waiting, armed with machetes. As a result of the defendant's alleged conduct, Pineda was brutally hacked to death. Regarding Castillo's murder, MS-13 members arranged to lure Castillo to an isolated area by the water in Freeport, where the defendant and others viciously attacked him, taking turns to strike Castillo with a machete until he was dead.

Given the obvious severity of the alleged crimes, the Court finds that this factor weighs strongly in favor of transfer and gives this factor more weight than any other. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious as—or even less serious than—the crimes alleged here. *See, e.g., United States v. Wilson*, 149 F.3d 610, 614 (7th Cir. 1998) (district court was "within its discretion to give more weight to the nature of the alleged offense than to the other factors" where defendant was charged with distributing cocaine and crack and had allegedly "brandished a gun and expressed a willingness to use it" in the course of that distribution); *One Juvenile Male*, 40 F.3d at 845–46 (district court did not abuse its discretion in concluding that the heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a passenger, "outweighed any factors that supported trying [the] defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *A.O.*, 2016 WL 4197597, at *7 (nature of alleged offense was most important factor and weighed in favor of transfer where juvenile defendant was charged with "the intentional shooting of two people, the reckless shooting of several

others, and the conscious decision to carry a firearm in connection with racketeering and narcotics-trafficking offenses"); *United States v. Doe #1*, 74 F. Supp. 2d 310, 321 (S.D.N.Y. 1999) (although majority of factors weighed against transfer, transfer was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence, [arising] out of his alleged involvement with a criminal organization," and where the defendant also had a "demonstrated tendency to revert to criminal behavior").

C. Nature and Extent of Any Prior Delinquency Record[12]

Separate and apart from the two murders and narcotic distribution charged here, the defendant has participated in other MS-13 gang activity. In January 2018, the defendant was charged in New York state court with two counts of conspiracy in the second degree to commit murder, one count of conspiracy in the second degree to commit criminal possession of a controlled substance in the second degree, and one count of conspiracy in the fourth degree to commit the criminal sale of a controlled substance in the third degree. (*See* Gov't Ex. 2 at 5–51.) In June 2018, the defendant pled guilty to one count of the state indictment—a July 2017 conspiracy to commit murder in the second degree, (*id.* at 71, 75), and admitted at his plea that he had "encountered an individual whom [he] planned to murder in Nassau County, and attempted to lure him into the woods by offering marijuana," (Gov't Ex. 4 (Transcript of Change of Plea Hearing) at 8–9). The defendant was sentenced to three to nine years' imprisonment and was transferred from the Nassau County Correctional Facility to a facility in upstate New York to complete his sentence. (Gov't Ex. 2 at 70; Gov't Ex. 5 at 1–2.)

Notably, the conduct underlying the state conspiracy conviction took place one year after the murders charged here. In short, the record demonstrates that even after allegedly participating in two brutal murders, the defendant continued to plot violent acts on behalf of the MS-13. Moreover, it demonstrates that at the time of his state incarceration, the defendant was still actively participating in MS-13 activity, a conclusion that is bolstered by the gang-related altercation that the defendant was disciplined for at the MDC. Therefore, the Court finds that this factor strongly weighs in favor of transfer. *See Juvenile No. 1*, 118 F.3d at 309 ("In addition to his numerous runaways, J.R.P. was charged in 1993 with theft of under $200 and in 1995 with theft of over $1500. On March 21, 1996, J.R.P. pled guilty to adult charges in state court of engaging in organized criminal activity. This evidence was sufficient to support the court's conclusion that this factor weighs in favor of transfer. The evidence indicates, as the court found, that J.R.P.'s delinquency record 'demonstrates a pattern of continuous lack of respect for authority. Although most of his prior offenses are non-violent runway [sic] charges, it indicates that his criminal activity is not an isolated event, but has continued

---

[12] Although the Second Circuit has not directly addressed the issue, there is a circuit split as to whether this factor is limited to convictions or encompasses unadjudicated conduct like prior arrests. *Compare United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998) (holding that Section 5032 "allows review of the delinquency *record*, which includes arrests as well as convictions"), *with United States v. Juvenile LWO*, 160 F.3d 1179, 1182–83 (8th Cir. 1998) (agreeing with the D.C. Circuit that "allowing a district judge to consider evidence of uncharged crimes . . . would violate the juvenile's due process rights" (citing *In re Sealed Case*, 893 F.2d at 368–69)). In any event, this Court need not resolve this question here because there is no dispute that the defendant has been convicted for the offense relied upon by the Court in relation to this factor and the Court is not considering any conduct that related solely to an arrest.

14

despite prior corrective and rehabilitative effort[s] in state court.'"); *Doe #1*, 74 F. Supp. 2d at 321 ("'[T]he court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant . . . . Of paramount concern to the court is [defendant's] demonstrated tendency to revert to criminal behavior.'").

D. Present Intellectual Development and Psychological Maturity

Generally, a juvenile defendant's "present intellectual development and psychological maturity support transfer where the juvenile is closer to average levels of intelligence and emotional or psychological maturity for the juvenile's age." *A.O.*, 2016 WL 4197597, at *7 (citing *Juvenile Male*, 844 F. Supp. at 345–46); *see also United States v. A.A.D.*, 106 F. Supp. 3d 272, 277 (D.P.R. 2015) ("Transfer to adult status is less favored for juveniles who exhibit low intellectual development and stunted psychological maturity because they are viewed as less responsible for their conduct.") (citing *J.D.*, 525 F. Supp. at 103–04)). As noted above, Dr. Goldsmith conducted a psychological evaluation of the defendant and detailed his findings in a written report. The Court has considered Dr. Goldsmith's findings—along with other evidence relating to the defendant's intellectual development and maturity outlined in the parties' submissions—and finds that this factor weighs in favor of transfer.

The record supports that the defendant possesses at least average intelligence for his age. The defendant does not appear to have any intellectual limitations and, aside from delayed walking, did not experience any developmental delays. (Goldsmith Rep. at 8.) Dr. Goldsmith conducted a mental status examination of the defendant, reporting that he appeared to have a "clear and organized" thought progress" and was "alert and oriented with no evidence of gross cognitive defects" or "delusions and hallucinations." (*Id.* at 4-5.)

Regarding the defendant's psychological maturity, Dr. Goldsmith's reporting is more mixed. On the one hand, Dr. Goldsmith reported that the defendant had likely met his developmental milestones and described him as "calm, pleasant and cooperative" and displaying no odd behaviors or mannerisms (*Id.* at 4–5, 8.) Although the defendant reported "struggling with some isolation," he displayed no suicidal ideation and reported "getting pleasure from his interests," including reading and physical exercise. (*Id.* at 5.) However, Dr. Goldsmith also diagnosed the defendant with Cannabis Use Disorder and noted that "use of large quantities of cannabis in adolescents is toxic to the developing frontal cortex." (*Id.* at 5–6.) Dr. Goldsmith reported that the defendant's heavy cannabis use "likely had negative effects on the development of his executive functioning" and may have caused impairments with respect to "judgement [sic], decision making and the inhibition of impulses." (*Id.* at 8.)

Upon review of the record, the Court concludes that Dr. Goldsmith's findings regarding the defendant's executive function issues are of limited significance in the context of this motion for two primary reasons.

First, the Court accepts Dr. Goldsmith's diagnosis of the defendant, specifically, that Cannabis Use Disorder can have detrimental effects on the developing adolescent brain. However, Dr. Goldsmith himself described the defendant as "evidenc[ing] clear and organized thinking," (*id.* at 5), and "not evidenc[ing] psychiatric or intellectual limitations," (*id.* at 8). Moreover, the defendant's interview displayed a clear awareness of his legal position and demonstrated an analytical ability to decide

15

what information to or not to share. (*See id.* at 4 ("I am waiting to see what happens . . . I have not seen anything, no evidence [from the government].") ("I don't want to say something to find out that is not how it is and I harm myself.").)

Second, the Court finds that the defendant's marijuana use cannot explain the defendant's alleged crimes, which were multiple, premediated, and particularly brutal in nature. As the government correctly asserts, "the crimes the defendant committed were not the product of momentary, impulsive decisions." (Gov't Reply Mem. at 3.) The defendant participated in the planning and execution of two murders, one of which involved him creating a Facebook page to engage with and lure a victim to his death. One year after these two murders, the defendant participated in a third murder conspiracy. Moreover, it is notable that the defendant described his decision to join the MS-13 gang as precisely that—a deliberate choice. (Goldsmith Rep. at 4.) This pattern of behavior demonstrates that these alleged crimes were not the result of impaired executive functioning but rather, the result of an ongoing desire to participate in MS-13 activity.

In sum, Dr. Goldsmith's diagnosis notwithstanding, the Court finds that, on balance, this factor weighs in favor of transfer. The defendant clearly had the ability to understand the consequences of joining the MS-13 gang and of participating in these alleged acts, and continually made the deliberate choice to do so. Simply put, the defendant had the cognitive ability "to conform his conduct to the law." *United States v. A.R.*, 203 F.3d 955, 962 (6th Cir. 2000); *Juvenile Male*, 269 F. Supp. 3d at 42–43 (concluding that transfer was warranted when the defendant "possesse[d] sufficient intellectual capacity and psychological maturity to, if he so chose, conform his conduct to the law and to appreciate the gravity of the charges he [was] facing"). Accordingly, the Court finds that this factor weighs in favor of transfer.

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

There is no evidence that, prior to his state detention, the defendant ever received any treatment or counseling.

Defense counsel asserts that, because of his state conviction and then because of the COVID-19 pandemic, the defendant had "no opportunity to get the benefit of any past treatment" or of any "psychological, educational or job-related programs." (Def. Memo at 2–3.) Accordingly, defense counsel argues that if the defendant is adjudicated as a juvenile, "he will get the benefits of programs that might be available that would allow him to live an honest[,] productive life." (*Id.* at 3.) Although this Court is aware of and sympathetic to the decreased amount of programming available due to COVID-19, it is not clear from the record that the defendant has "never had the opportunity to live in this country as an adult or take advantage of juvenile programs," as defense counsel contends. (*Id.* at 2.) Per the defendant's own statements, while incarcerated for his state conviction, he pursued his GED and took part in a drug treatment program. (*Id.* at 4.) Further, as the government points out, prior to his incarceration, the defendant had a steady job as a landscaper and had the opportunity to continue his high school education yet declined to do so, apart from taking some English classes at night. (*Id.* at 3; Gov't Reply Mem. at 2.) Moreover, despite these treatment efforts, the defendant has still participated in gang-related activity, most recently incurring a disciplinary infraction at the MDC for his part in the physical altercation described above. (Gov't Ex. 7 at 2–5.)

16

In sum, because the defendant has not made a demonstrable commitment to treatment efforts, and because there are indicators that there are impediments to rehabilitation (such as disciplinary infraction related to his alleged ongoing association with the MS-13), the Court finds that this factor weighs slightly in favor of transfer.

### F. Available Programs Designed to Treat the Juvenile's Behavioral Problems

Under this factor, the government bears the burden of establishing a lack of available programs designed to treat the juvenile's behavioral problems. *See, e.g., Nelson I*, 68 F.3d at 591. With respect to whether programs would be available to the defendant here if convicted as a juvenile, the government states that there are no federal facilities for individuals adjudicated as juveniles. (Gov't. Mem. at 30.) Instead, adjudicated juvenile delinquents from this district are sent, after screening, to state contract facilities for juveniles. (*Id.*) Neither the government nor defense counsel provides any details regarding any contract facilities in New York or elsewhere that would be available to someone the defendant's age. Thus, the government concedes that this factor "may weigh slightly against transfer" but asked that it "be given little or no weight." (*Id.*) The government also does not provide any information about treatment programs that would be available to the defendant if adjudicated as an adult.

As noted by the Second Circuit, "[f]or the government to carry its burden of persuasion [on this factor,] it must, of course, do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* The government has made no such showing here. Accordingly, the Court finds that the government has not met its burden on this factor and that this factor weighs against transfer. *See United States v. Doe #3*, 113 F. Supp. 2d 604, 609 (S.D.N.Y. 2000) (finding factor weighed against transfer where "the government did no more than 'merely assert the unavailability of an appropriate [juvenile rehabilitative] program' for the defendant" and therefore "failed to carry its burden of persuading the court that no such programs exist" (citing *Nelson I*, 68 F.3d at 591)).[13]

\*   \*   \*

In sum, after carefully balancing all the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is in the interest of justice. The defendant is charged, *inter alia*, with planning and executing the murders of two alleged rival gang members—one of whom was only 15 years old—as part of his alleged participation in the violent conduct of the MS-13 street gang. These crimes are precisely the types of serious, violent offenses that weigh strongly in favor of transfer. In addition to the gravity of the alleged crimes, other factors—including, among other things, the defendant's age and social background at the time of the murders, and ongoing participation in MS-13 activity—collectively demonstrate that the defendant is not likely to rehabilitate within the juvenile system if he is convicted of the charged crimes as a juvenile and provided with juvenile rehabilitation programs. Furthermore, as discussed above, the fact that the defendant is over 22 years old, considered in conjunction with the other

---

[13] Although the Court finds that this factor weighs against transfer, the Court also finds that this factor does not warrant maintaining the defendant's juvenile status because the overall balancing of the statutory factors overwhelmingly favors transfer.

factors, strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks omitted)); *In re J. Anthony G.*, 690 F. Supp. at 766. Accordingly, notwithstanding that some factors favor a denial of the transfer motion, the Court finds, after balancing all the statutory factors, that the defendant's rehabilitation potential within the juvenile justice system is extremely low.

As noted above, the Second Circuit has made clear that "the goal of rehabilitation must be balanced against 'the threat to society posed by juvenile crime.'" *Nelson II*, 90 F.3d at 640 (quoting *J.D.*, 525 F. Supp. at 103). Given the record here, the Court concludes in its discretion that there is no likelihood that the defendant will not pose a threat to society upon his release if his charges are adjudicated in the juvenile system. Accordingly, given that the crimes charged here are extremely violent and the threat to society posed by these crimes is at the highest level, and given that the overall record demonstrates that the defendant is unlikely to be rehabilitated in the juvenile system, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion to transfer the defendant to adult status is granted.

### IV. CONCLUSION

For the reasons explained above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

*/s/ Joseph F. Bianco*
JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: July 6, 2022
Central Islip, New York

\* \* \*

The United States is represented by Breon S. Peace, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722, by John J. Durham, Paul G. Scotti, Justina L. Geraci, and Megan E. Farrell, Assistant U.S. Attorneys. Defendant Juvenile Male is represented by Marion A. Seltzer, 1725 York Ave., Suite 16B, New York, New York, 10128.